**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**
Civil Action No.: 2:24-cv-00339-NT

TASHA VYE, Individually and on Behalf of All Other Persons Similarly Situated,

Plaintiff,

v.

HANNAFORD BROS. CO., LLC,

Defendant.

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION**

TABLE OF CONTENTS


I. INTRODUCTION ....1

II. PLAINTIFF HAS THE BURDEN TO ESTABLISH THAT CONDITIONAL CERTIFICATION IS APPROPRIATE ....2

III. PLAINTIFF'S CLAIM WILL REQUIRE AN INDIVIDUALIZED ANALYSIS OF EACH PLAINTIFF'S "PRIMARY DUTY" ....4

IV. SUMMARY OF THE EVIDENCE ....6

A. Plaintiff Seeks To Represent *Nine* Different Exempt, Manager-Level Positions Covering Approximately 1,250 Individuals ....6

B. Plaintiff and the Five Opt-In Plaintiffs Describe A Vastly Different Employment Experience Than Other Members Of The Putative Collective. ....8

C. Evidence Showing Plaintiff Managing Her Department Underscores The Individualized Analysis That This Case Will Require. ....13

V. PLAINTIFF HAS NOT CARRIED HER BURDEN TO SHOW THAT PLAINTIFF AND THE PUTATIVE COLLECTIVE ARE SIMILARLY SITUATED ....16

A. Plaintiff Has Not Offered Any Evidence That She Is Similarly Situated To Any Of The Putative Collective Action Members ....16

1. The fact that Hannaford classified all nine positions as exempt is insufficient as a matter of law to support conditional certification ....17

2. Plaintiff cannot rely on the written job descriptions and other corporate resources to support conditional certification when her entire claim seeks to discredit them ....18

3. Plaintiff has not offered any credible evidence that she performed the same job duties as the other putative collective action members. ....19

4. Plaintiff cannot rely on the *Prinzo* decision to satisfy her burden in this case ....20

5. Plaintiff has not provided any evidence regarding her alleged similarity to Center Store Managers or Customer Service Managers ....21

B. Plaintiff Ignores The Individualized Analysis That Lies Ahead And Offers No Solutions For How This Case Can Realistically Proceed As A Collective Action ....23

VI. THE PARTIES SHOULD BE PROVIDED AN OPPORTUNITY TO MEET AND CONFER REGARDING PLAINTIFF'S PROPOSED NOTICE ....25

VII. CONCLUSION ....25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Basco v. Wal-Mart Stores, Inc.*,
No. Civ.A. 00-3184, 2004 WL 1497709 (E.D. La. July 2, 2004)............................................3

*Benedict v. Hewlett-Packard Corp.*,
13-cv-00119-BLF, 2016 WL 3742342 (N.D. Cal. July 13, 2016)..........................................18

*Brown v. Barnes & Noble, Inc.*,
1:16-cv-07333 (RA), 2018 WL 3105068 (S.D.N.Y. June 25, 2018)......................................17

*Brown v. Barnes & Noble, Inc.*,
252 F. Supp. 3d 255 (S.D.N.Y. 2017)...........................................................17, 18, 19

*Burns v. City of Holyoke*,
881 F. Supp. 2d 232 (D. Mass. 2012) ..........................................................................1, 19

*Colson v. Avnet, Inc.*,
687 F. Supp. 2d 914 (D. Ariz. 2010) ..........................................................................3, 17

*Crowe v. Examworks, Inc.*,
136 F. Supp. 3d 16 (D. Mass. 2015) .................................................................................5

*Davine v. Golub Corp.*,
No. 14-30136-MGM, 2015 WL 1387922 (D. Mass. Mar. 25, 2015) ......................................3

*Dunkel v. Warrior Energy Servs.*,
2:13-cv-00695, 2015 WL 3604080 (W.D. Pa. June 5, 2015) ................................................21

*Evancho v. Sanofi–Aventis U.S. Inc.*,
No. 07-2266 (MLC), 2007 WL 4546100 (D.N.J. Dec. 19, 2007) ..........................................20

*Genesis v. Healthcare Corp. v. Symczyk*,
569 U.S. 66 (2013).........................................................................................................21

*Guillen v. Marshalls of MA, Inc.*,
750 F. Supp. 2d 469 (S.D.N.Y. 2010)..................................................................................3

*Hipp v. Liberty Nat'l Life Ins. Co.*,
252 F.3d 1208 (11th Cir. 2001) ..........................................................................................3

*Johnson v. VCG Holding Corp.*,
802 F. Supp. 2d 227 (D. Me. 2011) .....................................................................................3

*Kane v. Ollie's Bargain Outlet, Inc.*,
1:18-CV-02261, 2020 WL 6889195 (M.D. Pa. Nov. 24, 2020) ...........................................20

*Kirkpatrick v. Cardinal Innovations Healthcare Sol.*,
1:16CV1088, 2017 WL 3841858 (M.D.N.C. Sept. 1, 2017) ....................3

*Levin v. Vitamin Cottage Nat. Food Mrkt., Inc.*,
No. 20-cv-00261-STV, 2023 WL 3648684 (D. Col. May 25, 2023) ....................4, 18

*Lindsey v. Tire Disc., Inc.*,
2:15-cv-3065, 2017 WL 5972104 (S.D. Ohio Dec. 1, 2017) ....................18

*McDermott v. Fed. Sav. Bank*,
14-CV-6657 (JMA) (GRB), 2018 WL 1865916 (E.D.N.Y. Apr. 18, 2018) ....................17

*McGhee v. TOMS King, LLC*,
2:19-cv-01470-RJC, 2021 WL 1176097 (W.D. Pa. Mar. 29, 2021) ....................22

*McKnight v. Honeywell Safety Products, USA, Inc.*,
No. 16-132, 2017 WL 3447894 (D.R.I. June 13, 2017) ....................17, 20

*Mike v. Safeco Ins. Co. of Am.*,
274 F. Supp. 2d 216 (D. Conn. 2003) ....................18

*Morisky v. Pub. Serv. Elec. & Gas Co.*,
111 F. Supp. 2d 493 (D.N.J. 2000) ....................4

*Myers v. Hertz Corp.*,
624 F.3d 537 (2d. Cir. 2010) ....................3, 5, 23

*Nabarrette v. Property Servs., Inc.*,
15-CV-00211-RAJ, 2016 WL 7616717 (W.D. Tex. Apr. 4, 2016) ....................22

*O'Donnell v. Robert Half Intern., Inc.*,
429 F. Supp. 2d 246 (D. Mass. 2006) ....................6

*Oglesby v. Prof'l Transp., Inc.*,
8:19-cv-01573-TMC, 2020 WL 6048809 (D.S.C. Oct. 13, 2020) ....................23

*Perez v. Shucks Maine Lobster LLC*,
2:15-cv-00348-JAW, 2016 WL 6304674 (D. Me. Oct. 27, 2016) ....................4

*Prescott v. Prudential Ins. Co.*,
729 F. Supp. 2d 357 (D. Me. 2010) ....................2

*Prinzo v. Hannaford Bros. Co., LLC*,
No. 1:21-cv-11901 (D. Mass.) ....................20, 22, 23

*Scott v. Chipotle Mexican Grill, Inc.*,
954 F.3d 502 (2d. Cir. 2020) ....................4, 5

*Siu Ching Ha v. 4175 LLC*,
No. 15-5530 (ES) (MAH), 2018 WL 1509090 (D.N.J. Mar. 27, 2018) ....................23

*Skaggs v. Gabriel Bros., Inc.*,
1:19-cv-02032, 2021 WL 254113 (M.D. Pa. Jan. 26, 2021) ....................6, 20, 21

*Smith v. Smithfield Foods, Inc.*,
2:21-cv-194, 2021 WL 6881062 (E.D. Va. Dec. 21, 2021)....................19, 23

*Smith v. United States*,
156 Fed. Cl. 471 (Fed. Cl. 2021) ....................23, 24

*Streeter-Dougan v. Kirkston Mortg. Lending, LLC*,
3:13-cv-00166-RLY-WGH, 2013 WL 6174936 (S.D. Ind. Nov. 21, 2013)....................22

*Trezvant v. Fidelity Emp. Servs., Corp.*,
434 F. Supp. 40 (D. Mass. 2006) ....................3, 4

*Waters v. Day & Zimmermann NPS, Inc.*,
23 F.4th 84 (1st Cir. 2022)....................3

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
571 F.3d 953 (9th Cir. 2009) ....................18

*Wentworth v. Tacala, LLC*,
No. 10-AR-274-S, 2010 WL 11614318 (N.D. Ala. June 30, 2010)....................6, 20

*Yerger v. Liberty Mut. Grp., Inc.*,
5:11-CV-238-D, 2011 WL 5593151 (E.D.N.C. Nov. 15, 2011) ....................19

**Statutes**

29 U.S.C. § 216(b) ....................1, 2, 17, 25

**Other Authorities**

29 C.F.R. § 541.100 ....................5

29 C.F.R. § 541.200 ....................5

29 C.F.R. § 541.708 ....................5

Fed. R. Civ. P. 23 ....................20, 21, 22

## I. INTRODUCTION

Plaintiff Tasha Vye ("Plaintiff") filed this purported collective action against her former employer, Hannaford Bros. Co., LLC ("Hannaford"), alleging that Hannaford failed to pay her overtime compensation in violation of the Fair Labor Standards Act ("FLSA"). In her motion, Plaintiff asks this Court to conditionally certify a collective action under 29 U.S.C. § 216(b) and authorize Plaintiff to send notice to approximately 1,250 current and former Hannaford employees.

Plaintiff's proposed collective action is significantly broader than Plaintiff lets on. Though Plaintiff's motion refers to a singular group of "Department Managers," no such position exists at Hannaford. In reality, Plaintiff's proposed collective includes employees that worked in *nine* different positions (only *one* of which Plaintiff actually held), each responsible for managing one of *nine* distinct grocery store departments, across *162* different retail stores in *five* different states.

Though Plaintiff's burden at this stage may be "modest," it is not non-existent. Before exposing Hannaford to the burden and expense of defending a sprawling collective action, Plaintiff must first present actual evidence establishing that she and the other putative collective members performed similar "primary duties" and were victims of a common unlawful policy or plan, such that their FLSA misclassification claims can be effectively tried on a collective action basis. Plaintiff's motion, however, rests entirely on a handful of cookie-cutter declarations from herself and five Opt-In Plaintiffs, along with cherry-picked deposition excerpts and out-of-context documents from an entirely different case. This "evidence" is barely relevant to this case, much less proof that Plaintiff is similarly situated to the approximately 1,250 putative collective action members she seeks to represent.

Whatever can be said about Plaintiff's burden, conditional certification is not the foregone conclusion that Plaintiff apparently expects it be, and this Court should demand more of Plaintiff before sanctioning this "frivolous fishing expedition at [Hannaford's] expense." *Burns v. City of*

*Holyoke*, 881 F. Supp. 2d 232, 234-35 (D. Mass. 2012).

Plaintiff's alleged experience was not as common as her motion suggests. Instead, the evidence adduced so far, including eighteen declarations that Hannaford now submits with its opposition, shows that Plaintiff's experience, even taken as true for purposes of her motion, was materially different from others in the proposed collective. These differences matter and foreshadow the long road ahead. They demonstrate that Plaintiff's claim will require the factfinder to analyze each collective action member's exempt status, involving a person-by-person analysis of the job duties that each putative collective action member actually performed. Plaintiff fails to even acknowledge the obvious case management problems this will create, much less offer a reasonable path forward.

Conditional certification is a case-management tool that the Court can use in appropriate cases. But this is not one of those cases. Despite her burden to do so, Plaintiff has not offered any evidence that she is similarly situated to the putative collective action members or that a collective action covering approximately 1,250 individuals who worked in nine different positions, managing nine different types of departments across 162 stores in five states is even feasible. This Court should exercise its sound discretion to deny Plaintiff's motion.

## II. PLAINTIFF HAS THE BURDEN TO ESTABLISH THAT CONDITIONAL CERTIFICATION IS APPROPRIATE.

Section 216(b) of the FLSA permits a plaintiff to maintain a collective action to recover unpaid overtime "on behalf of himself . . . and other employees similarly situated." 29 U.S.C. § 216(b). District courts in the First Circuit generally follow a two-step process to certify a collective action under the FLSA. *See Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357, 364 (D. Me. 2010). At this first stage—commonly referred to as "conditional certification"—the court must

decide "whether notice should be given to potential collective action members" to inform them of the litigation and give them an opportunity to opt-in to the case. *Id*.

To justify sending notice, the plaintiff has the burden to convince the court that the "proposed members of a collective are similar enough to receive notice of the pending action." *Waters v. Day & Zimmermann NPS, Inc.*, 23 F.4th 84, 89 (1st Cir. 2022); *see also Johnson v. VCG Holding Corp.*, 802 F. Supp. 2d 227, 234 (D. Me. 2011) ("[The plaintiff] has the burden of showing a reasonable basis . . . that there are other similarly situated employees."). To carry this burden, "the plaintiff must put forth some evidence that the legal claims and factual characteristics of the class in the case are similar" and that "the putative class members were together the victims of a single decision, policy, or plan that violated the law." *Trezvant v. Fidelity Emp. Servs., Corp.*, 434 F. Supp. 40, 43 (D. Mass. 2006). Though the plaintiff's burden at this stage has been described as "lenient," the plaintiff's burden "is not invisible." *Davine v. Golub Corp.*, No. 14-30136-MGM, 2015 WL 1387922, at *2 (D. Mass. Mar. 25, 2015). Instead, "the factual showing, even if modest, must still be based on some substance." *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 480 (S.D.N.Y. 2010); *see also Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d. Cir. 2010) (noting that the plaintiff's burden "cannot be satisfied simply by unsupported assertions").

Though the decision to grant conditional certification "remains soundly within the discretion of the district court," *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001), the court should be careful not to "function as a rubber stamp for any and all claims that come its way." *Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 929-30 (D. Ariz. 2010); *see also Myers*, 624 F.3d at 555 n.10 (conditional certification is "a case management tool" to be used in "appropriate cases"). Indeed, conditionally certifying a case "for which there is insufficient support is an exercise in futility and wasted resources for all parties involved." *Basco v. Wal-Mart*

*Stores, Inc.*, No. Civ.A. 00-3184, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004); *Kirkpatrick v. Cardinal Innovations Healthcare Sol.*, 1:16CV1088, 2017 WL 3841858, at *4 (M.D.N.C. Sept. 1, 2017) ("[T]he court must be mindful that granting conditional certification expands the scope of the litigation and begins a process of class-wide discovery.").

## III. PLAINTIFF'S CLAIM WILL REQUIRE AN INDIVIDUALIZED ANALYSIS OF EACH PLAINTIFF'S "PRIMARY DUTY."

Section 216(b)'s "similarly situated" standard requires that the putative collective action members be "similarly situated to the plaintiff in relevant respects given the claims and defenses asserted." *Perez v. Shucks Maine Lobster LLC*, 2:15-cv-00348-JAW, 2016 WL 6304674, at *9 (D. Me. Oct. 27, 2016). Thus, "to be 'similarly situated' means that named plaintiffs and opt-in plaintiffs are alike with regard to some material aspect of their litigation." *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 516 (2d. Cir. 2020).

In a FLSA misclassification case, "the Court must consider the salient factors in [the] exemption analysis." *Levin v. Vitamin Cottage Nat. Food Mrkt., Inc.*, No. 20-cv-00261-STV, 2023 WL 3648684, at *3 (D. Col. May 25, 2023). This means that the similarly situated analysis must be conducted "in terms of the nature of the job duties performed by each class member, as the ultimate issue to be determined is whether each employee was properly classified as exempt." *Morisky v. Pub. Serv. Elec. & Gas Co.,* 111 F. Supp. 2d 493, 498 (D.N.J. 2000); *see also Trezant,* 434 F. Supp. 2d at 51 ("For a similarly situated showing as to the claim of unpaid overtime based on misclassification, some courts focus primarily on the job duties of the potential plaintiffs insofar as those duties relate to whether they were correctly classified.").

In this case, Hannaford contends that Plaintiff and each putative collective action member was properly classified as exempt under the FLSA's executive and administrative exemptions or,

alternatively, under the combination exemption. *See* 29 C.F.R. §§ 541.100,[1] 541.200,[2] 541.708[3].

Each of these exemptions turns on each employee's "primary duty," which means "the principal, main, major or most important duty that the employee performs." *Id.* at § 541.700(a). "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* Factors to consider include: "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

The FLSA "regulations make clear that these [exemption] questions must be resolved by examining the employee's actual job characteristics and duties." *Scott*, 954 F.3d at 504; *see also Myers*, 624 F.3d at 548 (the "primary duty" analysis "requires examination of the duties that the employee actually performs"); *Crowe v. Examworks, Inc.*, 136 F. Supp. 3d 16, 29 (D. Mass. 2015) ("[T]he regulations require a careful review of the job duties and responsibilities to determine whether the 'primary duty' test is satisfied."). This determination "involves a fact-intensive inquiry into [each employee's] job responsibilities and autonomy, the management style of the

[1] The executive exemption is satisfied where (1) the employee is paid a salary not less than $684 per week; (2) the employee's primary duty is management; (3) the employee customarily and regularly directs the work of two or more other employees; and (4) the employee has the authority to hire or fire other employees or their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. *See* 29 C.F.R. § 541.100(a).

[2] The administrative exemption is satisfied where (1) the employee receives at least $684 per week; (2) the employee's primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer; and (3) the employee's primary duty includes the exercise of discretion and independent judgment. *See* 29 C.F.R. § 541.200(a).

[3] The combination exemption is satisfied when "[e]mployees who perform a combination of exempt duties as set forth in the regulations . . . for executive [and] administrative . . . employees may qualify for exemption. Thus, for example, an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption. In other words, work that is exempt under one section of this part will not defeat the exemption under any other section." 29 C.F.R. § 541.708.

employee's supervisor and whether that employee worked over 40 hours per week." *O'Donnell v. Robert Half Intern., Inc.*, 429 F. Supp. 2d 246, 250 (D. Mass. 2006).

Given this individualized analysis, "[c]ourts have frequently held that the question of whether an employee qualifies for exempt status under the FLSA necessitates a fact-intensive inquiry, not well suited to collective action treatment." *Wentworth v. Tacala, LLC*, No. 10-AR-274-S, 2010 WL 11614318, at *4 (N.D. Ala. June 30, 2010); *see also Skaggs v. Gabriel Bros., Inc.*, 1:19-cv-02032, 2021 WL 254113, at *10 (M.D. Pa. Jan. 26, 2021) ("As many courts have recognized, determining the applicability of exemptions under the FLSA involves a fact-specific inquiry, often ill-suited to resolution in the context of a collective action."). Therefore, "[e]specially in cases based on claims of improper exemption, which by their nature are individualized claims, courts must make sure that FLSA plaintiffs have met their burden, and that collective treatment would serve the goals of fairness and judicial economy." *Wentworth*, 2010 WL 11614318, at *4.

## IV. SUMMARY OF THE EVIDENCE

### A. Plaintiff Seeks To Represent *Nine* Different Exempt, Manager-Level Positions Covering Approximately 1,250 Individuals.

Despite Plaintiff's repeated reference to "Department Managers," Plaintiff's proposed collective actually includes nine distinct managerial positions: (1) Bakery Sales Manager, (2) Deli Sales Manager, (3) Deli/Bakery Sales Manager, (4) Produce Sales Manager, (5) Meat Market Manager, (6) Meat Market/Seafood Sales Manager, (7) Deli/Seafood Manager, (8) Center Store Manager; and (9) Customer Service Manager. Dkt. No. 24 at 2. Though Plaintiff only worked as a Bakery Sales Manager in one store in Lewiston, Maine, Plaintiff seeks to represent employees who worked in any of the nine positions from 162 different retail stores across five different states.

*See* Exhibit 1 (Declaration of Andrea Nickerson ("Nickerson Decl.") ¶ 4). There are approximately 1,250 individuals who fall within Plaintiff's proposed collective. *Id.*

Each of these nine positions is a unique position separately responsible for managing a specific department or group of departments in a specific store. *Id.* at ¶ 3. No two departments in the same store are the same. Instead, each department sells different products or provides different services, has unique positions, different numbers of employees, varying sales volume and customer demands, and must adhere to different food safety and other department-specific practices. *Id.* at ¶ 6. Not surprisingly, these differences lead to meaningfully different types of work being performed in each department and directly impact how each managerial employee manages his or her respective department. *Id.*

Given these differences, Hannaford has developed a host of helpful resources that are unique to each department and each manager position. *Id.* at ¶¶ 6, 7, Ex. A. Contrary to Plaintiff's incorrect assertions, Hannaford has specific written job descriptions for each position, different training packets and programs for each position and department, and unique standard operating procedures and practice aids for each department. *Id.* at ¶¶ 7, 8, Ex. A. These materials are entirely department-specific and vary by department based on the type of work performed and supervised in each department. *Id.*

Hannaford designed each of the nine positions to be exempt, manager-level roles, and all of the relevant corporate documents define these positions in terms of their exempt, department-management duties. *Id.* at ¶ 6. Each written job description, for example, emphasizes their management duties; the manager-specific training materials are designed to help them perform their managerial duties related to their respective departments; and each year, they are evaluated on how well they manage their respective departments and teams. *Id.* at ¶¶ 7-8, 20, Ex. A. These

corporate resources are designed to reinforce Hannaford's expectation that each of the nine positions is primarily responsible for managing their respective departments. *Id.*

Hannaford classified all nine managerial positions as "exempt" after performing a position-by-position and store-by-store analysis. *Id.* at ¶ 19. In October 2024, Hannaford voluntarily decided to reclassify the positions to "non-exempt" and make them eligible for overtime compensation. *Id.*

### B. Plaintiff And The Five Opt-In Plaintiffs Describe A Vastly Different Employment Experience Than Other Members Of The Putative Collective.

In support of her motion, Plaintiff submitted declarations from herself and five Opt-In Plaintiffs (the "five Opt-In Plaintiffs") in which they go to great lengths to disparage their former positions. In nearly "rote" fashion (a word that surprisingly appears multiple times in each declaration)[4], Plaintiff and the five Opt-In Plaintiffs parrot the same made-for-litigation talking points, alleging that they spent the majority of their time performing non-exempt manual work, had little discretion to deviate from Hannaford's standard operating procedures, and were left out of critical hiring and other decisions for their departments. *See* Dkt. No. 24, Ex. 2 (Head Decl. ¶¶ 2-7, Exs. A-F).

These declarations should be read with a healthy dose of skepticism. Not only are all six declarations virtually identical, even down to their inclusion of the same typos[5], and filled with

[4] Dkt. No. 24, Ex. 2 (Head Decl. ¶¶ 2-7, Exs. A-F (Declaration of Tasha Vye ¶ 5 ("The manual tasks I performed were rote . . ."); Declaration of Michael Scott ("Scott Decl.") ¶ 5 ("The manual tasks I performed were rote . . ."); Declaration of DestinyLynn Sortino ¶ 5 ("The tasks I performed were rote."); Declaration of Ruth Iverson ¶ 5 ("These manual tasks I routinely performed were rote . . ."); Declaration of Shelly Corriveau ¶ 5 ("These manual tasks I routinely performed were rote . . . "); Declaration of Jordan Cole ¶ 5 ("The manual tasks I routinely performed were rote . . .")).

[5] M. Scott Decl. ¶ 7; D. Sortino Decl. ¶ 7; R. Iverson Decl. ¶ 7; S. Corriveau Decl. ¶ 7; J. Cole Decl. ¶ 7 ("I did not have authority [sic] hire, fire, or discipline employees . . ."); R. Iverson Decl. ¶ 5, and R. Iverson Decl. ¶ 5 ("I complied [sic] Hannaford's standard and processes throughout my tenure . . .").

legal terms of art such[6], but even at this early stage of the case, Hannaford has already identified evidence that seriously undermines their purported testimony. As discussed *infra* in Section IV.C., Hannaford has attached e-mail communications, annual self-evaluations, and other documents showing Plaintiff managing her department, as well as a sworn declaration from Plaintiff's former store manager directly contradicting the allegations in her declaration. Similar evidence exists for the five Opt-In Plaintiffs.

But even crediting these cookie-cutter declarations, Plaintiff and the five Opt-In Plaintiffs appear to have little in common with the putative collective action members that Plaintiff seeks to represent. As an initial matter, Plaintiff did not even bother to submit any evidence regarding the Center Store Manager and Manager of Customer Service positions—two positions that neither Plaintiff nor any of the five Opt-In Plaintiffs ever held—or evidence related to any managers who worked in two of the five states covered by her class definition (i.e., Vermont and Massachusetts). Even more to the point, Hannaford has submitted declarations from eighteen putative collective members, each of whom overwhelmingly reject the overly simplistic picture that Plaintiff and the five Opt-In Plaintiffs try to paint of their former positions.[7] These putative collective action members view themselves as the managers that Hannaford expected them to be and speak of their positions in terms of their management responsibilities.[8]

Unlike the declarations from Plaintiff and the five Opt-In Plaintiffs, the declarations submitted by Hannaford contain more than mere catch phrases. These putative collective action

[6] T. Vye Decl. ¶¶ 4, 6, 8 (using legal terms such as "exempt" and "non-exempt"); M. Scott Decl. ¶¶ 4, 6, 8 (same); D. Sortino Decl. ¶¶ 4, 6, 8 (same); R. Iverson Decl. ¶¶ 4, 8 (same); S. Corriveau Decl. ¶¶ 4, 8 (same); J. Cole Decl. ¶¶ 4, 6, 8 (same).

[7] These declarations are attached hereto as Exhibits 4-22 in alphabetical order by last name. These declarations are herein referred to using the following shorthand: "[First Initial]. [Last Name] Decl. ¶ [Paragraph Number]."

[8] M. Ketchum Decl. ¶ 5; E. Waters Decl. ¶ 3; K. Shattuck Decl. ¶ 5; Taylor Decl. ¶ 6; R. McKenzie Decl. ¶ 7; I. Sipic Decl. ¶ 4; C. Moore Decl. ¶ 4; F. Westcott Decl. ¶ 4; K. Carney Decl. ¶ 4; L. Clement Decl. ¶ 3.

members describe, in great detail, how they manage their respective departments and, in doing so, provide a small snapshot of the multitude of exempt, management-level tasks that they perform each and every day, including:

- Supervising a full team of hourly associates, ranging anywhere from 5 to 80 or more full-time and part-time associates.[9]
- Assigning tasks and directing the work of a team of hourly associates.[10]
- Interviewing and hiring associates for their department, including deciding which candidates to interview, leading those interviews, and making the final hiring decisions.[11]
- Mentoring associates and identifying high performers for potential advancement within the company, including successfully grooming associates for promotion opportunities.[12]
- Formally evaluating their associates each year by completing a written evaluation form that is used to determine if the associate is eligible for a raise and leading a one-on-one evaluation meeting with each associate.[13]
- Preparing and revising the weekly work schedule to ensure that their department has adequate coverage to meet customer and other business demands.[14]
- Managing associate attendance, including approving vacation and other time-off requests.[15]

---

[9] C. Jones Decl. ¶ 3; K. Shattuck Decl. ¶ 6; C. Moore Decl. ¶ 6; E. Waters Decl. ¶ 3; I. Sipic Decl. ¶ 4; K. Carney ¶ 5; R. McKenzie Decl. ¶ 4; M. Ketchum Decl. ¶ 3; S. Cummings Decl. ¶ 3; S. Richards Decl. ¶ 5; S. Richards Decl. ¶ 5; K. Leighton Decl. ¶ 3; K. Taylor Decl. ¶ 3; B. Sloan Decl. ¶ 4; L. Clement Decl. ¶ 4.

[10] F. Westcott Decl. ¶ 7; C. Jones Decl. ¶ 6; C. Moore Decl. ¶ 7; E. Waters Decl. ¶ 4; I. Sipic Decl. ¶ 5; K. Carney Decl. ¶ 6; R. McKenzie Decl. ¶ 7; M. Ketchum Decl. ¶ 5; S. Cummings Decl. ¶ 4; S. Richards Decl. ¶ 7; V. Piccola Decl. ¶ 6; H. Richards Decl. ¶ 6; K. Leighton Decl. ¶ 7; K. Taylor Decl. ¶ 8; B. Sloan Decl. ¶ 6; D. Herbert Decl. ¶ 6; L. Clement Decl. ¶ 6.

[11] C. Jones Decl. ¶ 12, 13; C. Moore Decl. ¶¶ 11, 12; E. Waters Decl. ¶ 7; F. Wescott Decl.¶ 10; I. Sipic Decl. ¶ 7; K. Carney Decl. ¶ 10; K. Shattuck Decl. ¶ 7; R. McKenzie Decl. ¶ 5; M. Ketcham Decl. ¶¶ 12, 13; S. Richards Decl. ¶ 9; V. Piccola Decl. ¶ 9; H. Richards Decl. ¶¶ 12, 13; K. Leighton Decl. ¶¶ 13, 14; K. Taylor Decl. ¶ 11; B. Sloan Decl. ¶¶ 12, 13; D. Hebert Decl. ¶ 11; L. Clement Decl. ¶¶ 13, 14.

[12] C. Jones Decl. ¶ 19; B. Sloan Decl. ¶ 16; K. Leighton Decl. ¶ 18; M. Ketchum Decl. ¶ 17; C. Moore Decl. ¶ 18, K. Taylor Decl. ¶ 12; L. Clement Decl. ¶ 17.

[13] C. Jones Decl. ¶¶ 18, 19; C. Moore Decl. ¶ 16; K. Carney Decl. ¶ 12; K. Shattuck Decl. ¶ 9; M. Ketchum Decl. ¶ 15; S. Cummings Decl. ¶ 6; S. Richards Decl. ¶ 14; V. Piccola Decl. ¶ 10; H. Richards Decl. ¶ 15; K. Leighton Decl. ¶ 16; K. Taylor Decl. ¶ 17; B. Sloan Decl. ¶¶ 15, 16; D. Hebert Decl. ¶ 14; L. Clement Decl. ¶ 16.

[14] C. Jones Decl. ¶ 11; C. Moore Decl. ¶ 9; E. Waters Decl. ¶ 6; M. Ketchum Decl. ¶ 18; F. Wescott Decl. ¶ 5; Jones Decl. ¶ 11; K. Carney Decl. ¶ 7; K. Shattuck Decl. ¶ 10; R. McKenzie Decl. ¶ 6; I. Sipic Decl. ¶ 9; S. Cummings Decl. ¶ 9; S. Richards Decl. ¶ 16; H. Richards Decl. ¶ 18; K. Leighton Decl. ¶ 20; K. Taylor Decl. ¶ 9; B. Sloan Decl. ¶ 17; D. Hebert Decl. ¶ 17; L. Clement Decl. ¶ 18.

[15] C. Jones Decl. ¶ 11; K. Leighton Decl. ¶ 21; D. Hebert Decl. ¶ 18; C. Jones Decl. ¶ 11; S. Cummings Decl. ¶ 9; H. Richards Decl. ¶ 18; B. Sloan Decl. ¶ 17; I. Sipic ¶ 9.

- Ensuring that all associates in their department are adequately trained.[16]
- Managing the performance of each of their associates by overseeing and correcting their work.[17]
- Disciplining associates, including initiating Hannaford's progressive disciplinary process and being involved at every step.[18]
- Though these putative class members report performing manual, non-exempt tasks from time to time (albeit less frequently than Plaintiff and the five Opt-In Plaintiffs suggest), they do so when they personally decide it is the best use of their time and they remain in charge of their departments even when they perform such work.[19]

In describing their experiences, these putative collective action members directly contradict virtually all of the assertions from Plaintiff and the five Opt-Ins Plaintiffs. Take, for example, the hiring process. Unlike Plaintiff and the five Opt-In Plaintiffs, who claim in their declarations that they had limited involvement in the hiring process, barely, if ever, participated in interviews, and had no discretion as to whom to hire, these putative collective members report being personally involved in all aspects of the hiring process—from selecting which candidates to interview, to leading those interviews, to making the final hiring decision.[20] Their declarations are full of personal anecdotes describing their personal interview styles, hiring preferences, and the qualities

[16] C. Jones Decl. ¶ 8; C. Moore Decl. ¶ 8; E. Waters Decl. ¶ 8; F. Westcott Decl. ¶ 11; I. Sipic Decl. ¶ 8; K. Carney Decl. ¶ 8; K. Shattuck Decl. ¶ 8; M. Ketchum Decl, ¶ 14; S. Cummings Decl. ¶ 5; S. Richards Decl. ¶ 11; H. Richards Decl. ¶ 17; K. Leighton Decl. ¶ 19; K. Taylor Decl. ¶ 14; B. Sloan Decl. ¶ 14; D. Hebert Decl. ¶ 16; L. Clement Decl. ¶ 15.

[17] C. Moore Decl. ¶ 8; K. Carney Decl. ¶ 9; B. Sloan Decl. ¶ 7; D. Hebert Decl. ¶ 9; H. Richards Decl. ¶ 8; I. Sipic Decl. ¶ 6; K. Leighton Decl. ¶ 10; K. Taylor Decl. ¶ 8; M. Ketchum Decl. ¶ 7; S. Cummings Decl. ¶ 7; S. Richards Decl. ¶ 8; V. Piccola Decl. ¶ 8; L. Clement Decl. ¶ 8.

[18] C. Jones Decl. ¶ 17; C. Moore Decl. ¶ 19; K. Carney Decl. ¶ 11; M. Ketcham Decl. ¶ 11; S. Richards Decl. ¶ 13; H. Richards Decl. ¶ 14; K. Leighton Decl. ¶ 15; K. Taylor Decl. ¶ 15; B. Sloan Decl. ¶ 7; D. Hebert Decl. ¶ 9; L. Clement Decl. ¶ 12.

[19] C. Jones Decl. ¶ 6; E. Waters Decl. ¶ 9; I. Sipic Decl. ¶ 6; R. McKenzie Decl. ¶ 8; M. Ketcham Decl. ¶ 10; S. Cummings Decl. ¶ 7; S. Richards Decl. ¶ 8; V. Piccola Decl. ¶ 8; H. Richards Decl. ¶ 5; K. Leighton Decl. ¶ 12; K. Taylor Decl. ¶ 7; B. Sloan Decl. ¶ 10; D. Hebert Decl. ¶ 10; L. Clement Decl. ¶ 11.

[20] C. Jones Decl. ¶ 12, 13; C. Moore Decl. ¶¶ 11, 12; E. Waters Decl. ¶ 7; F. Wescott Decl.¶ 10; I. Sipic Decl. ¶ 7; K. Carney Decl. ¶ 10; K. Shattuck Decl. ¶ 7; R. McKenzie Decl. ¶ 5; M. Ketcham Decl. ¶¶ 12, 13; S. Richards Decl. ¶ 9; V. Piccola Decl. ¶ 9; H. Richards Decl. ¶¶ 12, 13; K. Leighton Decl. ¶¶ 13, 14; K. Taylor Decl. ¶ 11; B. Sloan Decl. ¶¶ 12, 13; D. Hebert Decl. ¶ 11; L. Clement Decl. ¶¶ 13, 14.

they look for in particular candidates.[21] These two descriptions of the hiring process could not be more different.

These putative collective action members also fundamentally disagree with Plaintiff's suggestion that they lack managerial discretion and are constrained by practice aids and other standard operating procedures. Unlike Plaintiff and the five Opt-In Plaintiffs, these putative collective action members view these resources as the helpful guides that Hannaford intended them to be, and do not see them as a corporate edict telling them how to run their departments.[22] Ultimately, these putative collective action members state that they regularly exercise their own discretion to run their departments as they see fit.[23]

These are just a few of the many differences. As shown in the side-by-side comparison chart that Hannaford has submitted as part of this opposition, *see* Exhibit 2 (Declaration of Ryan

---

[21] K. Shattuck Decl. ¶ 7 ("I've developed an interview style where I have a casual conversation with the candidate and get to know them and talk through what the job is like rather than drilling them with questions."); I. Sipic Decl. ¶ 7 ("I look for associates who are willing to work, are team-players, would get along with the team, and are adaptable to change."); K. Carney Decl. ¶ 10 ("When I interview candidates, I consider their availability and their personality, in particular whether they will be outgoing enough to interact with customers."); H. Richards Decl. ¶ 13 ("When interviewing applicants, I like to take them through the Produce Department so they can get a better understanding of the role they've applied for, and ask them about their work history. I also assess whether they will be a good fit for the department. My department is fast-paced, and during the interview I work to make sure the applicant understands what the role entails, and assess whether I think they are willing to put in the effort the position requires.")

[22] C. Jones Decl. ¶ 10; F. Westcott Decl. ¶ 9; K. Carney Decl. ¶ 14; K. Shattuck Decl. ¶ 13; M. Ketcham Decl. ¶ ¶ 8, 9; S. Cummings Decl. ¶ 8; H. Richards Decl. ¶ 9; K. Leighton Decl. ¶ 9; B. Sloan Decl. ¶¶ 8, 9; C. Jones Decl. ¶ 16; C. Moore Decl. ¶ 20; E. Waters Decl. ¶ 5; F. Westcott ¶ 9; K. Shattuck Decl. ¶ 14; S. Richards Decl. ¶ 17; V. Piccola Decl. ¶ 7; H. Richards Decl. ¶ 10; K. Leighton Decl. ¶ 8; K. Taylor Decl. ¶ 19; D. Hebert Decl. ¶ 8; L. Clement Decl. ¶¶ 9, 10.

[23] F. Westcott Decl. ¶ 9 ("I have to adjust my delegation and prioritization of daily tasks based on associate skill and cannot rely on the Labor Standards to determine what needs to get done each day."); E. Waters Decl. ¶ 5 ("While the Standard Practices and Training Aids are guidelines I would use for training associates and determining if their work was sufficient, these guidelines did not control how I spent my day, managed my department, or delegated tasks to associates."); H. Richards Decl. ¶ 9 ("Although Hannaford has certain recommendations regarding how much time individual tasks should take, like cutting fruit or preparing greens, I don't think all of the time standards are realistic. They also do not cover all of the tasks I perform on a daily basis as a manager. For example, as a manager, I am often tasked with helping other departments or store management, which the recommendations do not take into account at all."); K. Leighton Decl. ¶ 8 ("Hannaford provides us standard practice guides that generally describe how to perform certain tasks, like stocking milk, stocking eggs, and building stacks in aisles. Although I find these standard practice guides helpful in managing my department efficiently and training my associates, I still have discretion to manage my department as I see fit.").

Glasgow ¶ 2, Ex. A), these two sets of declarations depict two fundamentally different versions of the same positions. These differences make clear that Plaintiff's purported experience, even if credited, is not representative of the rest of the putative collective and that her claim is not suitable for collective treatment.

### C. Evidence Showing Plaintiff Managing Her Department Underscores The Individualized Analysis That This Case Will Require.

In direct contrast to Plaintiff's cookie-cutter declaration, Hannaford has attached *actual* evidence showing Plaintiff performing her managerial responsibilities *in real time*. Not only does this evidence directly contradict the allegations in her declaration, but it also provides a glaring preview of the fact-intensive, evidence-heavy, individualized inquiry that will be required if this case is allowed to proceed as a collective action.

Focusing just on Plaintiff, Hannaford has attached a small sampling of the available documents that Hannaford intends to rely on to rebut Plaintiff's own claim. These documents, among many others, show Plaintiff performing her exempt managerial and administrative duties, including time-stamped e-mail communications, disciplinary write-ups, performance evaluations, and contemporaneous handwritten notes. *See* Nickerson Decl. ¶¶ 22-25, Exs. C-K[24]. For example:

- Hannaford has attached a sample of write-ups and other disciplinary documents that Plaintiff issued to the associates she supervised for a number of policy violations and performance issues, including inappropriate "outbursts," attendance, job performance, and food safety. *Id*. at ¶ 21, Ex. C.
- Hannaford has attached a sample of performance evaluations that Plaintiff prepared for her associates. In these performance reviews, Plaintiff assigned each associate a formal rating and provided substantive feedback regarding their job performance. *Id*. at ¶ 22, Ex. D.
- Hannaford has attached a sample of training packets that Plaintiff completed for her associates to signify that she had fully trained them and that they had completed all of the

[24] Exhibits E-K to Ms. Nickerson's declarations have been redacted to protect the privacy of the hourly associates that Plaintiff supervised who are not parties to this litigation.

required training modules and on-the-job training to Plaintiff's satisfaction. *Id*. at ¶ 23, Ex. E.

Hannaford has also attached a number of e-mail communications that Plaintiff sent and received during her time as the Bakery Sales Manager that show Plaintiff actively participating in the hiring process and supervising her team. *Id*. at ¶ 25, Ex. F-K. For example:

- Hannaford has attached an e-mail that Plaintiff sent to the Associate Relations Manager ("ARM") and her Store Manager informing them that she would not be moving forward with a newly hired associate, writing: "I am beyond working with her any further. I don't know what more we in the bakery could do for her. Not sure if she wants to try [another department] . . . but I cannot realistically keep her in the bakery." *See id.* at ¶ 25, Ex. J.

- Hannaford has attached an e-mail from Plaintiff summarizing a counseling session that she conducted with an associate regarding their cake decorating skills, cleanliness, and their attitude toward customers. *See id.* at ¶ 25, Ex. K.

- Hannaford has attached two e-mails from Plaintiff documenting coaching sessions that she held with two associates regarding their poor attendance. *See id.* at ¶ 25, Exs. F, H.

- Hannaford has attached an e-mail between Plaintiff and the Associate Relations Manager ("ARM") regarding a prospective candidate in which the ARM wrote to Plaintiff: "If you want to hire [the candidate], you can offer her the position . . . [or] [i]f you want to think about it and go another route we can do this as well" and Plaintiff responded that the candidate was "a go." *See id.* at ¶ 25, Ex. I.

- Hannaford has attached a second e-mail between Plaintiff and the ARM regarding a different candidate in which Plaintiff informed the ARM that she would like to hire that particular candidate. *See id.* at ¶ 21, Ex. G.

Hannaford has also provided Plaintiff's 2021 Annual Performance Evaluation in which Plaintiff highlighted, *in her own words*, her management responsibilities. Plaintiff, for example, used her performance review to describe her transition to the Bakery Sales Manager position, stating that this new position required her to be "the head decision maker in the bakery" and to "manage a team." *Id*. at ¶ 20, Ex. B. Reflecting on her performance, Plaintiff noted that she "was able to really embrace" her new management position and "take it head on." *Id*. Looking forward, Plaintiff stated that she planned to focus on "getting better with delegating more tasks" and "recognizing associates more." *Id*. Plaintiff's evaluation barely even mentions any of the manual,

non-exempt tasks that she now claims were her "primary duty." Needless to say, Plaintiff certainly saw herself as an exempt manager at that time.

In addition to this documentary evidence, Hannaford has submitted a sworn declaration from Plaintiff's former store manager, Todd Pelletier, who directly contradicts many of the allegations in Plaintiff's declaration, including Plaintiff's suggestion that she had limited management authority, that she was not involved in the hiring process, and that she spent the majority of her time performing "non-exempt duties." *See* Exhibit 3 (Declaration of Todd Pelletier ("Pelletier Decl.") ¶¶ 6-10). As he explains in his declaration, Plaintiff "had full discretion to manage her department as she saw fit" and "her most important responsibility was to manage the Bakery Department and supervise the employees working in the department"—not the manual tasks that she decided to perform from time to time. *Id*. Mr. Pelletier also disputes Plaintiff's assertion that she was not involved in the hiring process, describing, instead, how Plaintiff personally decided to hire her best friend, her best friend's mother, and a former colleague. *Id*. at ¶ 8.

This evidence is by no means exhaustive. This is merely a sampling of the *hundreds* of other documents and related evidence showing Plaintiff managing her department. If this matter were to proceed to trial, Hannaford would introduce *hundreds* of similar documents and elicit hours of testimony from Plaintiff's managers, co-workers, and direct reports to dispute Plaintiff's claim.

Aside from undermining Plaintiff's own claim, this evidence foreshadows the painstakingly individualized analysis that lies ahead and shows why a collective action is not appropriate in this case. The "primary duty" analysis at the heart of Plaintiff's claim requires a fact specific analysis based on *each plaintiff's* experience, facts, and documents. The evidence

used to prove or disprove the exempt status for one manager will necessarily be different from the evidence used to prove or disprove the exempt status for a different manager. Therefore, Hannaford would need to introduce evidence *specific to each opt-in plaintiff* to properly defend against each of their claims.

Take, for example, Plaintiff's self-evaluation where she described herself as a the "head decision maker in the bakery," *see* Nickerson Decl. ¶ 20, Ex. B, or the e-mail that she sent to her store manager saying she could not "realistically keep" a newly associate, *see id.* at ¶ 25, Ex. J, or the testimony from her store manager where he specifically recalled Plaintiff exercising her hiring authority to hire her best friend, *see* Pelletier Decl. ¶ 8. While these documents and testimony are certainly persuasive evidence that Plaintiff was properly classified as exempt, they say little about whether every other putative collective action member was also classified correctly. Instead, what matters for the other putative collective action members would be their own documents and evidence and testimony from their own managers.

Put simply, if this case proceeds as a collective action, Hannaford would need to introduce *hundreds* of documents unique to *each and every single* opt-in plaintiff and present testimony regarding *each and every single* opt-in plaintiff's management duties to prove their exempt status. It is simply not possible to try this case as a collective action.

## V. <u>PLAINTIFF HAS NOT CARRIED HER BURDEN TO SHOW THAT PLAINTIFF AND THE PUTATIVE COLLECTIVE ARE SIMILARLY SITUATED.</u>

### A. Plaintiff Has Not Offered Any Evidence That She Is Similarly Situated To Any Of The Putative Collective Action Members.

Though Plaintiff broadly claims that Hannaford had "a uniform company-wide policy of misclassifying [department managers] as exempt employees," Dkt. No. 24 at 2, Plaintiff offers no support for any such "policy." Indeed, as discussed below, the only so-called "evidence" that Plaintiff relies upon is inadequate, insufficient, and/or irrelevant to the exemption analysis.

1. <u>The fact that Hannaford classified all nine positions as exempt is insufficient as a matter of law to support conditional certification.</u>

Plaintiff's suggestion that Hannaford's classification decision supports conditional certification is a legal non-starter. *See Brown v. Barnes & Noble, Inc.*, 252 F. Supp. 3d 255, 262 (S.D.N.Y. 2017) (denying conditional certification) ("[T]he mere classification of a group of employees—even a large or nationwide group—as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes."); *McKnight v. Honeywell Safety Products, USA, Inc.*, No. 16-132 S, 2017 WL 3447894, at *9 (D.R.I. June 13, 2017) (denying conditional certification) ("[The employer's] classification of [employees] as exempt, standing alone, is insufficient to satisfy the lenient standard for certification."); *Colson*, 687 F. Supp. 2d at 929-30 (describing it as a matter of "common sense").

The same is true for Hannaford's recent decision to voluntarily reclassify the positions as non-exempt. *See Brown*, 252 F. Supp. 3d at 263 ("For the same reason why courts will not automatically certify a collective action simply because a group of employees are classified as exempt, Defendant's reclassification of the [] position also is insufficient to justify conditional certification."); *McDermott v. Fed. Sav. Bank*, 14-CV-6657 (JMA) (GRB), 2018 WL 1865916, at *4 (E.D.N.Y. Apr. 18, 2018) ("A blanket decision to reclassify employees is not sufficient to establish that potential plaintiffs were victims of a common policy that violated the law."). That is because reclassification of a position "says nothing about their primary duties at the time [the positions] were classified as exempt." *Brown v. Barnes & Noble, Inc.*, 1:16-cv-07333 (RA) (KHP), 2018 WL 3105068, at *17 (S.D.N.Y. June 25, 2018).

Put simply, neither decision is legally sufficient to justify conditional certification or "eliminate[s] the need to make a factual determination as to whether class members are actually

performing similar duties." *Benedict v. Hewlett-Packard Corp.*, 13-cv-00119-BLF, 2016 WL 3742342, at *9 (N.D. Cal. July 13, 2016) (quoting *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009)); *see also Levine*, 2023 WL 3648684, at *14 (same).

2. <u>Plaintiff cannot rely on the written job descriptions and other corporate resources to support conditional certification when her entire claim seeks to discredit them.</u>

Plaintiff's efforts to rely on the written job descriptions and other corporate resources to support conditional certification are likewise unavailing. As an initial matter, Plaintiff incorrectly suggests that Hannaford uses a uniform job description and the same training and other corporate resources for all nine positions. As detailed above, this is incorrect. *See supra* Section IV.A. Though a particular department manager may not need additional training if they changed stores (as Plaintiff points out), they would certainly need additional training if they switched departments. Nickerson Decl. ¶¶ 7-8, 20.

Even more to the point, all of these documents speak in terms of the management duties performed by each manager and categorically support Hannaford's decision to classify these positions as exempt. Plaintiff cannot legitimately rely on these documents for conditional certification when her misclassification claim rests entirely on these documents being inaccurate. *See Brown*, 252 F. Supp. 3d at 263 ("[The plaintiff] cannot point to the job description as evidence that all [putative collective action members] perform similar duties when, under Plaintiff's own theory of the case, the job description did not accurately reflect the duties they personally performed."); *Lindsey v. Tire Disc., Inc.*, 2:15-cv-3065, 2017 WL 5972104, at *7 (S.D. Ohio Dec. 1, 2017) ("Plaintiffs therefore cannot rely on [the] uniform job description and training as evidence of a single FLSA-violating policy applicable to all [collective action members], because their claims rest on the irrelevance of that policy to [their] actual employment."); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003) (holding that the plaintiff cannot rely on the

written job description to support conditional certification where the plaintiff "expressly disavows this job description"). As these cases make clear, Plaintiff cannot have it both ways.

3. <u>Plaintiff has not offered any credible evidence that she performed the same job duties as the other putative collective action members.</u>

Plaintiff has not provided any legitimate evidence that she and the putative collective action members had similar primary duties. The fill-in-the-blank declarations from Plaintiff and the five Opt-In Plaintiffs are certainly not sufficient. *See Brown*, 252 F. Supp. 3d at 263-64 (rejecting the plaintiff's attempt to rely on "cookie cutter" declarations that "use self-serving legal terms of art"); *Smith v. Smithfield Foods, Inc.*, 2:21-cv-194, 2021 WL 6881062, at *8 (E.D. Va. Dec. 21, 2021) (denying conditional certification and rejecting "suspiciously identical" declarations from opt-in plaintiffs); *Yerger v. Liberty Mut. Grp., Inc.*, 5:11-CV-238-D, 2011 WL 5593151, at *5 (E.D.N.C. Nov. 15, 2011) (denying conditional certification: "[T]he declarations essentially recite the same language, suggesting that the declarants signed them without significant reflection."); *Burns*, 881 F. Supp. 2d at 235 (rejecting "boilerplate affidavits").

Even if the Court credits these declarations, they only get Plaintiff but so far. Indeed, all of the other evidence before the Court, including the declarations from eighteen other putative collective action members, shows that Plaintiff's experience, if believed, was far less common than her motion suggests. As detailed above, these other putative collective action members describe their jobs in starkly different terms and fundamentally disagree with most of the assertions in Plaintiff's and the five Opt-In Plaintiffs' declarations. *See supra* Section IV.B. These declarations make clear that Plaintiff and the five Opt-In Plaintiffs cannot be the thread that ties this case together.

Though the Court does not need to resolve these factual disputes at this time, these differences matter and they foreshadow the morass that awaits if Plaintiff is allowed to proceed

with conditional certification. *See Skaggs*, 2021 WL 254113, at *13 (denying conditional certification due to the "significant differences in job duties" because "[t]he court would need to conduct individualized inquiries into each Plaintiff's job duties—a task ill-suited for collective resolution"); *Kane v. Ollie's Bargain Outlet, Inc.*, 1:18-CV-02261, 2020 WL 6889195, at *11 (M.D. Pa. Nov. 24, 2020) (denying conditional certification because the court "would need to conduct an examination of each Plaintiff's duties and responsibilities to determine whether they would be exempt from the FLSA's overtime provisions"); *Wentworth*, 2010 WL 11614318, at *2 (denying conditional certification where the plaintiff failed to "provide a solid evidentiary basis for the court to believe that all potential class members' job duties are or were substantially similar"); *Evancho v. Sanofi–Aventis U.S. Inc.*, No. 07-2266 (MLC), 2007 WL 4546100, at *5 (D.N.J. Dec. 19, 2007) (denying conditional certification where the evidence submitted by the parties indicated that employee responsibilities "vary among plaintiffs and potential collective action members"); *accord McKnight*, 2017 WL 3447894, at *8 ("[C]ourts should take note of sworn statements from other employees in the proposed collective that contradict those of the named plaintiffs.").

4. <u>Plaintiff cannot rely on the *Prinzo* decision to satisfy her burden in this case.</u>

Perhaps sensing the weakness of her own motion, Plaintiff tries to rely on Judge Young's decision in *Prinzo v. Hannaford Bros. Co., LLC*, No. 1:21-cv-11901 (D. Mass.) ("*Prinzo*"), an entirely different case in which Judge Young granted Ms. Prinzo's motion to certify a class of "fresh" department managers under Rule 23. *See* Dkt. No. 24 at pgs. 7-8. Though Plaintiff pretends that the two cases are the same, these two cases are different in number of material respects.

For example, the *Prinzo* case was a Rule 23 class action under the Massachusetts Wage Act (as opposed to a FLSA collective action); only included 116 class members who worked in

fifteen stores in one division in Massachusetts (as opposed to approximately 1,250 collective members from 162 stores across thirteen Districts in five different states); and did not include Center Store Managers or Customer Service Mangers (two positions that Plaintiff seeks to represent in this case even though she failed to put forth any evidence regarding these two positions).

These differences in size and scope are amplified in the context of a FLSA collective action where, unlike a Rule 23 class action, any individual that opts in to the case will become "party plaintiffs" and will have an affirmative obligation to meaningfully participate in the case—including discovery and at trial. *See Genesis v. Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013) ("Rule 23 actions are fundamentally different from collective actions under the FLSA."); *see also Dunkel v. Warrior Energy Servs.*, 2:13-cv-00695, 2015 WL 3604080, at *2 (W.D. Pa. June 5, 2015) ("[FLSA opt-ins] are, by statute, 'party plaintiffs,' so they have some responsibility to participate in the lawsuit that they have joined."). The inclusion of up to 1,250 potential opt-ins raises obvious manageability concerns given the highly individualized "primary duty" analysis that awaits every single one of these "party plaintiffs."

In short, these two cases are not the same, legally or practically. As such, this Court should perform its own, independent assessment whether it "can coherently manage the [case] in a manner that will not prejudice any party," *Skaggs*, 2021 WL 254113, at *10, and should not be unduly swayed by Judge Young's opinion in an entirely different case covering a materially different (and significantly smaller) class.

5. <u>Plaintiff has not provided any evidence regarding her alleged similarity to Center Store Managers or Customer Service Managers.</u>

Plaintiff has not offered any evidence whatsoever to support including Center Store Managers and Customer Service Mangers in this case—two positions that neither Plaintiff nor any

of the five Opt-In Plaintiffs ever held. Indeed, beyond including these positions in her proposed class definition, Plaintiff has failed to provide any evidence regarding their job duties or responsibilities or any evidence suggesting a connection to Plaintiff or this case.

This is reason enough to deny Plaintiff's motion for conditional certification. *See McGhee v. TOMS King, LLC*, 2:19-cv-01470-RJC, 2021 WL 1176097, at *5 (W.D. Pa. Mar. 29, 2021) (noting that it is "axiomatic" that conditional certification is not appropriate for positions that the named plaintiff "never held" and for which the plaintiff did not submit evidence); *Nabarrette v. Prop. Servs., Inc.*, 15-CV-00211-RAJ, 2016 WL 7616717, at *4 (W.D. Tex. Apr. 4, 2016) (denying conditional certification for two positions that the named plaintiff never held); *Streeter-Dougan v. Kirkston Mortg. Lending, LLC*, 3:13-cv-00166-RLY-WGH, 2013 WL 6174936, at *2 (S.D. Ind. Nov. 21, 2013) (denying conditional certification where the plaintiff did not "provide any documentary evidence" that other positions not held by the plaintiff "were the victims of an overtime violation").

These two positions are not as easily written-off as Plaintiff's motion suggests. Center Store Managers and Customer Service Managers oversee departments that are materially different from some of Hannaford's other departments in terms of size, store footprint, number of employees, and reporting structure. Nickerson Decl. ¶¶ 10-18. Center Store Managers, for example, supervise an extraordinarily large team of employees who are responsible for stocking and restocking thousands of non-perishable items in the center store aisles, which span nearly the entire width of the retail store. *Id*. at ¶ 11; *see also* K. Leighton Decl. ¶ 3. Customer Service Managers oversee the entire front-of-store operations, which includes supervising an equally large team of cashiers and baggers, overseeing the store's financial and bookkeeping processes, and interfacing with Hannaford's customers. *Id*. at ¶ 15; *see also* D. Hebert Decl. ¶ 3; K. Taylor Decl.

¶ 3. In fact, they often report to an entirely different Assistant Store Manager from the other managers. *Id*. at ¶ 5. These differences led Ms. Prinzo to voluntarily drop these two positions from her case before requesting Rule 23 certification from Judge Young. *Compare Prinzo v. Hannaford Bros. Co., LLC*, No. 1:21-cv-11901 (D. Mass.) (Dkt. No. 1 (Notice of Removal), Ex. A (Compl. ¶ 11)) *with Prinzo v. Hannaford Bros. Co., LLC*, No. 1:21-cv-11901 (D. Mass.) (Dkt. No. 27).

Conditional certification "requires a factual nexus, not an assumption of facts." *Siu Ching Ha v. 4175 LLC*, No. 15-5530 (ES) (MAH), 2018 WL 1509090, at *6 (D.N.J. Mar. 27, 2018) (denying conditional certification). Plaintiff has failed to offer any evidence regarding these two positions, let alone a "factual nexus" showing that she is similarly situated to them.

### B. Plaintiff Ignores The Individualized Analysis That Lies Ahead And Offers No Solutions For How This Case Can Realistically Proceed As A Collective Action.

Plaintiff completely ignores the case management problems that her claim will create and says nothing in her motion about how this case can feasibly proceed as a collective action. Notwithstanding Plaintiff's head-in-the-sand approach, "[c]ase management considerations are at the heart of the conditional certification process," *Smith v. United States*, 156 Fed. Cl. 471, 483 (Fed. Cl. 2021), and allowing Plaintiff to proceed with conditional certification will inevitably turn this "case management tool" on its head. *Myers*, 624 F.3d at 555 n.10; *see also Oglesby v. Prof'l Transp., Inc.*, 8:19-cv-01573-TMC, 2020 WL 6048809, at *5 (D.S.C. Oct. 13, 2020) ("[E]ven if Plaintiff could show that she is similarly situated to the other members of the proposed class, the court would still be inclined to deny certification, in its discretion, in light of the manageability issues posed by allowing this case to proceed as a collective action."); *Smith*, 2021 WL 6881062, at *6 (noting that the "potential difficulties implicit in managing a trial of the putative class, when

compared against Plaintiffs' meager evidence of similarity, cautions against [granting conditional certification]").

The Court needs to look no further than the evidence that Hannaford has already submitted to see the obvious impracticality of allowing this case to proceed as a collective action. Take, for example, only *one* of the allegations in Plaintiff's declaration—namely, that she did not have the authority to hire or discipline her associates. Vye Decl. ¶ 5. To disprove this unfounded assertion, Hannaford would introduce specific evidence showing Plaintiff exercising her authority to hire and discipline her associates. This evidence would include documentary evidence specific to Plaintiff, including e-mails and text messages that she sent and received, her performance evaluations, disciplinary write-ups that she prepared, employee investigation notes that she took, and disciplinary forms she authored, as well as specific testimony from Plaintiff's store manager, assistant store managers, direct reports, and other managers who witnessed her performing her exempt, management duties. The factfinder would need to parse through hundreds of pages of documents and related evidence and hear countless hours of testimony. And this is just for Plaintiff and for only one of her factual allegations.

This type of individualized analysis would need to be repeated *for every single factual allegation* and *for every single opt-in plaintiff* and would require Hannaford to introduce *hundreds* of records and *countless hours* of testimony *unique to every single opt-in plaintiff*. This is because Hannaford cannot rely on evidence related to one opt-in plaintiff to prove the exempt status of another opt-in plaintiff. Rather, the only way for Hannaford to show that a particular opt-in plaintiff was properly classified as exempt would be to introduce evidence *specific to that particular opt-in plaintiff*. Whether viewed as a matter of case management or simple practicality,

this type individualized and evidence-heavy analysis "does not fit [any] definition of efficient." *Smith*, 156 Fed. Cl. at 483.

## VI. THE PARTIES SHOULD BE PROVIDED AN OPPORTUNITY TO MEET AND CONFER REGARDING PLAINTIFF'S PROPOSED NOTICE.

As part of her motion, Plaintiff attaches a proposed notice for Court approval. Dkt. No. 24, Ex. 2 (Head Decl. ¶ 13, Ex. L). Notwithstanding Plaintiff's suggestion that Hannaford should be required to respond to Plaintiff's proposed notice as part its opposition, the parties previously agreed that, if the Court were to grant Plaintiff's motion, the parties would meet and confer regarding the notice and to submit any disagreements to the Court within fourteen (14) days after the Court rules on Plaintiff's motion. *See* Dkt. No. 19. Specifically, in the parties' Joint Proposed Discovery and Motion Plan, the parties agreed and proposed to submit an agreed upon Section 216(b) notice and/or any unresolved issues to the Court "[w]ithin 14 days after the Court rules on Plaintiff's motion for conditional certification." *Id*. Therefore, if the Court grants Plaintiff's motion (which, for all the reasons stated above, it should not), Hannaford requests the Court provide the parties that previously proposed and agreed-upon opportunity to meet and confer regarding the notice.

## VII. CONCLUSION

This is not an appropriate case for conditional certification. Far from carrying her burden, Plaintiff has not shown that she is similarly situated to the approximately 1,250 putative collective action members she seeks to represent or that a collective action is even a feasible, much less an appropriate, way to adjudicate her highly individualized claim. Given the obvious legal and practical inefficiencies that would result if this case is allowed to move forward as a collective action, the Court should deny Plaintiff's motion.

Dated: January 30, 2025

**HANNAFORD BROS CO., LLC**

/s/ Katharine I. Rand
Katharine I. Rand
Pierce Atwood LLP
254 Commercial Street
Portland, ME 04101
Telephone: (207) 791-1100
krand@pierceatwood.com

**HUNTON ANDREWS KURTH LLP**

Ryan A. Glasgow (VA Bar. No. 71023) (*pro hac vice*)
Tyler S. Laughinghouse (VA Bar No. 84099) (*pro hac vice*)
Elizabeth H. King (VA Bar No. 99419) (*pro hac vice*)
951 East Byrd Street
Richmond, VA 23219
Telephone: (804) 788-8200
rglasgow@huntonak.com
tlaughinghouse@huntonak.com
eking@huntonak.com

Christopher M. Pardo (Maine Bar No. 006508)
60 State Street, Suite 2400
Boston, MA 02109
Telephone: (617) 648-2759
cpardo@huntonak.com

*Attorneys for Hannaford Bros Co., LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 30th day of January, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send a copy to all counsel of record.

/s/ Katharine I. Rand
Katharine I. Rand